## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JI SU AI, RUOHONG LI, and YI DING, Individually and on Behalf of All Others Similarly Situated, <br><br> v. <br><br> FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER LLC, a/k/a FLEET NEW YORK METROPOLITAN REGIONAL CENTER LLC, EEGH, L.P., EASTERN EMERALD GROUP LLC, RICHARD XIA a/k/a YI XIA, <br><br> Defendants. | **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED <br><br> Case No: 21-cv-5250 |

Plaintiffs Ji Su Ai, Ruohong Li, and Yi Ding, individually and on behalf of all others similarly situated, by and through Plaintiffs' undersigned attorneys, bring this action against Fleet New York Metropolitan Regional Center LLC ("General Partner"), EEGH, L.P. ("Partnership"), Eastern Emerald Group LLC ("Developer"), and Richard Xia a/k/a Yi Xia ("Xia") (collectively "Fleet Group"), and allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, Plaintiffs' counsel's investigation, which includes without limitation, a review of: (a) the Offering Documents (defined below); (b) applicable Department of Buildings filings, (c) zoning requirements, and (d) other publicly available information concerning Defendants.

## NATURE OF THE ACTION AND OVERVIEW

1.      Plaintiffs and other members of the putative class ("Class Members") are foreign nationals who invested $500,000 in the Partnership pursuant to the United States Government's EB-5 Immigrant Investor Program, plus an additional $50,000 in administrative fees. Under the

EB-5 program, investors (and their spouses and unmarried children under 21) are eligible to apply for a Green Card (permanent residence) if they (a) make the necessary investment in a commercial enterprise in the United States; (b) which results in the creation or preservation of 10 permanent full-time jobs for qualified U.S. workers.

2.      Plaintiffs' capital was pooled with the capital of the Partnership's other investors and loaned to the Developer, an affiliate of the General Partner.

3.      The Partnership, the General Partner, and the Developer are all dominated and controlled by Xia.

4.      According to the Limited Partnership Agreements, the Private Placement Memoranda ("PPM"), and the Comprehensive Plans (collectively the "Offering Documents") provided to Plaintiffs and Class Members to solicit their investments in the Partnership beginning in 2014 or 2015, the Developer would use the EB-5 funds for the construction and development of a luxury hotel complex in Corona, Queens County, New York City (the "Project").

5.      The Offering Documents provided to Plaintiffs and Class Members made representations concerning the Project as follows:

- a total floor area of 643,180 square feet;[1]

- a 5-star luxury hotel consisting of 25 floors and 498 ocean-view hotel rooms;[2]

- a modern convention center certified by the International Association of Conference Centers  with 105,964 square feet;[3]

- retail shopping area with 97,180 square feet;[4]

---

[1] EEGH, LP Comprehensive Business Plan at 2.
[2] *Id.* at 1.
[3] *Id.* at 1-2.
[4] *Id.* at 2.

- the creation of 2,913 jobs within the first two years of operations;[5]

- "[j]obs will be created within 2.5 year after I-526 petition approval";[6]

- total projected 5-year hotel revenue of approximately $217 million;[7]

- total projected 5-year hotel revenue of approximately $218 million;[8] and

- the total development of the Project would take 42 months, with 30 months for construction.[9]

6.      However, these representations had no reasonable basis in fact at the time they were made, and they grossly misrepresented the (1) scope of the Project; (2) square footage, (3) development timeline; and (4) job creation numbers. Each is discussed in the paragraphs below.

7.      **Scope:** Defendants represented that the Project will consist of a 25-story 5-star luxury hotel, modern convention center, retail and restaurant space, and a parking garage. However, as Department of Buildings filings have revealed, no such 25-story hotel, convention center, or retail center was ever part of the plan.

8.      **Square Footage:** The maximum allowable square footage allowed for a building can be calculated using a Floor Area Ratio ("FAR") which is mandated by local zoning ordinances. The FAR for the Project's location would never have allowed for a building of 643,180 square feet. Despite Defendants' claims in the Offering Documents that the Project would have close to 650,000 square feet, the Project was limited, by applicable zoning regulations, to as little as 150,000 square feet.

9.      **Development Timeline:** Despite Defendants' claims in the Offering Documents

---

[5] *Id.* at 17, 40.
[6] *Id.* at 18.
[7] *Id.* at 43.
[8] *Id.* at 47.
[9] *Id.* at 17.

that the Project would take 42 months to complete, with 30 months for construction, construction has barely begun, as the foundation has not yet even been completed

10.    **Job Creation Numbers:** Despite Defendants' claims in the Offering Documents that up to 2,913 jobs would be created by the Project (which would have been well in excess of the number of jobs needed to allow each investor in the Partnership (approximately 160 in total) to obtain a permanent green card), the Project has not triggered the job creation numbers to permit Plaintiffs and Class Members to obtain permanent green cards.

11.    Defendants' misrepresentations of the Project constitute fraud, and their failure to act with diligence to pursue development constitutes breach of fiduciary duty and aiding and abetting such breach.

12.    Given the fraud and breaches of fiduciary duty committed by Defendants, each Class Member has suffered damages, both from failure to recoup their monetary investment as well as the failure to obtain a permanent green card.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds the jurisdictional minimum of this Court, exclusive of interest and costs, and Plaintiff and Defendants are citizens of, and domiciled in, different jurisdictions, either foreign or domestic. This action, which is brought under Fed. R. Civ. P. 23, is not a collusive one to confer jurisdiction that the court would otherwise lack.

14.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity as described above.

15.    This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

16.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud and/or breaches of fiduciary duty, or the effects of such have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

17.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

18.    Plaintiff Ji Su Ai, a citizen of China, currently resides at 1037 Budapest perenyi ut 31, 14ep, tt5a, Hungary.

19.    Plaintiff Ruohong Li, a citizen of China, currently resides at 41-202 Huafaxincheng, Xiangzhou District, Zhuhai City, Guangdong Province, China.

20.    Plaintiff Yi Ding, a citizen of China, currently resides at Room 1-501, Yunxiang Building, Jichang Lu #5375, Longwan District, Wenzhou City, Zhejiang Province, China.

21.    Defendant Federal New York Metropolitan Regional Center LLC a/k/a Fleet New York Metropolitan Regional Center LLC ("General Partner"), a New York limited liability company, with its principal place of business and service of process address at 136-20 38th Ave., Suite 10F, Flushing, New York, is the General Partner of the Partnership.

22.    Defendant Eastern Emerald Group LLC ("Developer") is, on information and

belief, a New York limited liability company, with its principal place of business at 136-20 38th Ave., Suite 10F, Flushing, New York.

23.     Defendant EEGH, L.P. ("Partnership") is a New York limited partnership, with its principal place of business and service of process address at 136-20 38th Ave., Suite 10F, Flushing, New York.

24.     Defendant Richard Xia a/k/a Yi Xia ("Xia"), an individual who, upon information and belief, resides in Flushing, New York, is the President of, and controls and dominates, the Developer, the General Partner, and the Partnership.

## SUBSTANTIVE ALLEGATIONS

### A.  The EB-5 Program

25.     The EB-5 immigrant visa program ("EB-5 Program") is administered by the U.S. Citizenship and Immigration Services ("USCIS"), which permits qualified foreign investors to obtain permanent residency if they invest in certain commercial enterprises that meet certain qualifications, including, but not limited to, the creation or preservation of at least 10 jobs per investor.[10]

26.     Generally, a business that seeks to raise funds through the EB-5 Program will form a new commercial enterprise, such as the Partnership here, and will solicit foreign investors seeking to immigrate to the United States to invest in the Partnership and to be the limited partners.

27.     After the investors subscribe to become limited partners in the Partnership and make the required investments, they file a Form I-526 Immigration Petition for Entrepreneur ("I-526 Petition") with USCIS to show, based on the project's business plan and supporting documents, that their investments will satisfy EB-5 requirements. 8 U.S.C. § 1153(b)(5); 8 C.F.R.

---

[10] *See* www.uscis.gov/eb-5.

§ 204.6(a) and (j). Upon approval of the I-526 Petition, USCIS will grant the investor conditional permanent residency, often referred to as a "conditional green card." 8 U.S.C. § 1186b(a)(1).

28.     Within two years after receiving a conditional green card, the investor must file with USCIS a Form I-829 Petition by Entrepreneur to Remove Conditions on Permanent Resident Status ("I-829 Petition") to prove that the investor has satisfied the investment and job creation requirements of the EB-5 Program, at which time the green card becomes permanent. 8 U.S.C. § 1186b(c); 8 C.F.R. § 216.6(a) and (c). The project financed by the EB-5 investment must create at least 10 full-time jobs for U.S. workers for an investor to obtain unconditional permanent residency.

**B.  Class Members' Investments in the Partnership**

29.     The Partnership in this case is an investment vehicle formed by the Fleet Group to provide EB-5 financing for the expansion and operation of a luxury complex in Queens County, New York.

30.     The Partnership planned to make a loan using the EB-5 offering proceeds ("EB-5 Loan") to an affiliated real estate management and development company, the Developer, which was the "job creating entity" for the purpose of complying with the EB-5 Program. The Developer would then use the loan proceeds for the construction of a luxury hotel, convention center, and retail and restaurant space.

31.     In or about 2013, the Fleet Group began soliciting foreign investors to participate in the EB-5 Program to raise capital to fund the EB-5 Loan. To facilitate the EB-5 capital raising, the Fleet Group prepared and issued Offering Documents for the Partnership.

32.     Plaintiffs and Class Members were provided with these Offering Documents, which offered them the opportunity to invest a subscription amount of $500,000 in the Partnership and

become a Limited Partner.

33.     The Offering Documents, including the PPM, LP Agreement, and Business Plan, contained material representations regarding the investment in the Partnership.

34.     In the "SUMMARY OF TERMS" section of the PPM, the General Partner represented that "The Eastern Emerald Project will encompass the development, management and operation of 5-star hotel, convention center, retail space, restaurant and parking garage."

35.     In the "EASTERN EMERALD PROJECT" section of the PPM, the General Partner represented that:

> The Partnership will [sic] using the capital investment from EB-5 investors to finance the development, construction and operation of a project located in Corona, City of New York, Queens, New York ("Eastern Emerald Project").
>
> The Eastern Emerald Project is expected to consist [sic] a 498-room 5-star luxury hotel, retail stores (97,180 square feet), an IACC certified international conventional center (105,964 square feet), a restaurant (11,300 square feet), and a parking garage with 400 parking spaces covering 82,490 square feet.

36.     In the "Project Overview" Section of the Business Plan, the General Partner represented that:

> EEGH will use the capital investment from EB-5 investors to issue a loan to Eastern Emerald Group LLC ("EEC"), which will u se the loan proceeds together with the funds from other domestic sources to purchase the land, construct, manage and operate a mixed-use commercial project consisting of a 498-room luxury 5-Star hotel, convention center, parking garage, retail spaces and restaurant in the City of Corona, Queens County, New York (the "Project"). The luxury 5-Star hotel will have 498 ocean view rooms occupying 25 stories. EEC will own, operate and manage the Project. The 5-star luxury hotel, convention center and restaurant will be operated by EEC itself, and the retail spaces will be leased out by EEC to tenants.

37.     In the Project Description section of the Business Plan, the General Partner represented:

> The Project is located at 112-21 Northern Blvd, Corona, Queens County, State of New York, 11369. The Project involves land acquisition, construction, management and

operation of a mixed-use commercial project in Corona, Queens County, overlooking Flushing Bay. When complete, the hotels will boast 25 floors of 5-star ocean view rooms. Additionally, the convention center and restaurant will be operated by the Project, and the retail spaces will be leased out to tenants.

The Project will feature one of the largest modern convention centers in northeastern USA which satisfies the Code of Sustainability certified by International Association of Conference Centers ("IACC"). Signing the Code of Sustainability demonstrates a level of commitment that far surpasses the adoption of some "green practices."

The Project is located in close proximity to LaGuardia Airport, CITI Field and USTA National Tennis Center. Th e surrounding areas include much smaller buildings (8 stories at most), which guarantees a clear view of Flushing Bay, Manhattan and the majestic sites of the surrounding area.

38.     The Project Description section of the Business Plan set forth the following table to summarize the size of the Project:

| Project Breakdown (square-footage) | |
| --- | --- |
| Description | Size (SF) |
| 5-Star Hotel | 346,246 |
| Convention Center | 105,964 |
| Retail Shopping Area | 97,180 |
| Parking Garage | 82,490 |
| Restaurant | 11,300 |

39.     In the "Project Highlight" Section of the Business Plan, the General Partner represented that the Project would have the following features:

- New ground-up construction of a mixed-use commercial project

- 25 floors of 5-star ocean view rooms

- The first luxury class hotel development in Queens County

- The only modern convention center with 105,964 square feet in the Project area.

- Convention center satisfies the code of sustainability required by International Association of Conference Centers.

40.     In the "Target Market and Marketing Strategy" Section of the Business Plan, the

General Partner represented that:

> Location is the primary selling point for new project space to be constructed under Federal New York Metropolitan Regional Center. The Project will have one of the largest modern convention centers in northeastern USA. Moreover, the project is 10 miles from Times Square and with easy access to major highways and public transport hubs. The location of the Project is also central to many of the area's major attractions such as CITI Field, USTA National Tennis Center, and also benefits from fast access to the region's three major airports. These major attractions will draw hotel guests, and those looking for a modern venue to host events as well as consumers looking for restaurant and retail needs. The project will be advertised and marketed by internet, television advertisements and mailings as part of a massive media campaign to promote the new facility.

41.    The Offering Documents included a report entitled Economic Impact of Construction and Operation of a Mixed-Use Commercial Project Located at 112-21 Northern Blvd, Corona, Queens, NY ("Economic Impact Study"), which stated that the jobs to be created by the Project – *i.e.*, a critical requirement for Plaintiff and Class Members to obtain their green cards – will be calculated based on the construction cost of the Project and the operations of the 5-star luxury hotel, convention center, restaurant, and retail space.

42.    This report stated that the Project would create 2,913 jobs, far more than the number of jobs required for the EB-5 eligibility of all Partnership limited partners.

43.    Relying on these representations in the Offering Documents, Plaintiffs and the other Class Members invested $500,000 in the Partnership and became Limited Partners.

44.    Upon information and belief, the Partnership eventually raised $80 million in EB-5 capital from 160 foreign investors, including the $500,000 raised from each Plaintiff and each of the Class Members.

45.    After investing in the Partnership, Plaintiffs and Class Members submitted their initial immigration petitions to USCIS (referred to as the Form I-526 Petition), by which each investor was required to show that based on the business plan of the Project, his/her capital will be used to create 10 jobs.

46.     The I-526 Petitions were approved by USCIS, allowing Plaintiffs and Class Members temporary green cards. However, this approval does not mean that Plaintiffs or the other Class Members are eligible, yet, for a permanent green card. For that, they will need to file Form I-829 Petitions in the future demonstrating that their capital was in fact used to create the required number of jobs.

47.     Unfortunately, given Defendants' malfeasance, including their failure to pursue development of the Project in accordance with the business plan, it has become increasingly unlikely that Plaintiffs and Class Members will ever be able to file these Form I-829 petitions, and the immigration prospects for Plaintiffs and the other Class Members now appear to be doomed.

### C.  Defendants Misrepresented the Project and Failed to Disclose Material Information Regarding Zoning Restrictions

48.     Defendants repeatedly and falsely stated in the Offering Documents that the mixed-use commercial Project would be a massive 643,180 square-foot project, featuring a 498-room, 25-story, 5-star luxury hotel with a world-class convention center, restaurant, and retail space. However, these representations were false.

49.     As early as July 2014, the Developer had filed an application for the Project with the New York City Department of Buildings ("DOB") revealing that the plan was to construct a 12-story (not a 25-story) building with a total zoning area of 350,186 square feet (not 643,180 square feet). There is no convention center, retail space, or restaurant in the plan.

50.     The initial filing was not a mere placeholder application. Very little has changed in the seven years since. The plans associated with the currently approved DOB application show a building significantly different than that described in the Offering Documents. The zoning floor area is approximately half of what is presented in the Offering Documents, and highlights of the original plan, such as a large convention center and retail center, are not in the approved plans.

51.     While it is not unheard of to obtain approval of a building in order to start construction and then later submit a revised or updated design, available records show that Defendants had no intention of constructing the Project in accordance with the plans as forth in the Offering Documents.

52.     Indeed, on April 10, 2019, the Developer submitted an application to the New York City Bureau of Standards and Appeals, seeking an approval to exceed height limits. The BSA application contains the following description of the Project:

> The Development would contain approximately 350,178 square feet of zoning floor area, including approximately 175,056 square feet of residential use (approximately 252 dwelling units), approximately 16,150 square feet of retail space, approximately 129,730 square feet of hotel space (approximately 200 hotel rooms), and approximately 29,242 square feet of community facility space.

53.     No matter how tall the building will be, the approved DOB application and BSA Application relating to the Project both confirm that the total zoning floor area of the Project is approximately 350,000 square feet (including commercial, residential, and community facility use), a mere 62% of the 560,690 square-foot building (deducting 82,490 square feet of garage floor area) represented in the Offering Documents.

**D.  Zoning Floor Area and Floor Area Ratio**

54.     The General Partner failed to disclose to investors that based on the zoning code, it is impossible to build a hotel with the promised size, nature, and features without obtaining various variances from BSA and DOB.

55.     The General Partner's fraudulent omissions relate to a zoning concept referred to as zoning floor area ("zoning floor area" or "ZFA"), which is the maximum permitted floor area for the development site.

56.    The maximum ZFA for a development site is calculated by the applicable floor area ratio ("floor area ratio" or "FAR").

57.    FAR is a mathematical formula that determines how many square feet can be developed on a property in proportion to the lot area. To determine the maximum developable square footage of a proposed building, the property area is multiplied by the FAR factor -- the result is the maximum floor area allowed for a building on the lot, no matter how many stories the building is planned to have.

58.    The local zoning code will assign a designated FAR based on the zoning district and building use.

59.    A mixed building's maximum zoning floor area can equal the highest FAR of any of the uses in the building but each individual use cannot exceed its own FAR.

60.    Based on investigation by Plaintiffs' Counsel, the zoning floor area of 350,186 square feet as set forth in the DOB application is the Project's maximum zoning floor area allowable by DOB and BSA.

61.    By way of further explanation, the use with the highest FAR for the district where the Project is located is "community facility" use, which has an FAR of 4.8. In order to maximize the zoning floor area of the Project, each plan submitted to DOB by the General Partner includes a community facility use. By including this use, the Project has an FAR of 4.8. This means the Project has a maximum zoning floor area of approximately 350,000 square feet (*i.e.*, the lot area of 72,955 square feet multiplied by the 4.80 FAR results in a maximum zoning floor area of 350,184 square feet).

62.     The maximum permitted size of the Project (350,184) is far smaller than the size of the Project as stated in the Offering Documents, 560,690 square-foot building (deducting 82,490 square feet of garage floor area which is excluded from the calculation of zoning floor area).

63.     While a portion of the Project can be put to commercial use, such as a hotel, the commercial portion **cannot exceed its own FAR of 2.00.** Therefore, the maximum zoning floor area of the Project that can be put to commercial use is 145,910 square feet, calculated as the 72,955 square foot lot size multiplied by the commercial FAR of 2.0. The maximum permitted hotel size of 145,910 square feet is far smaller than -- approximately 42% the size of – the size of the hotel as represented in the Offering Documents (346,246 square feet).

64.     Over the past seven years, none of the applications submitted by Defendants to the DOB or BSA requested a variance of the FAR or maximum zoning floor area to increase the permitted floor area of the Project to be anywhere close to the 643,180 square feet as represented in the Offering Documents.

65.     Although a Project's zoning floor area can differ slightly from its total gross floor area (because unoccupied space such as a garage or elevator shaft is not counted for zoning floor area), the huge discrepancy between the Project size in the Offering Documents and the maximum zoning floor area cannot be justified by any legitimate explanation. The only plausible explanation is that Defendants, who are well-versed in New York City construction, did not intend to build a Project of the size and scope as represented in the Offering Documents.

66.     Even for a much smaller Project developed within applicable zoning limitations, less than half of the building can be put to commercial use. The rest of the building would be for residential and community facility uses based on Defendant's plans filed with the DOB and BSA, which were not disclosed to investors in the Offering Documents.

67.     Moreover, based on the permissible floor area for commercial uses, there is no available space for the supposed modern convention center, retail center, and restaurant. These three commercial portions of the building would total more than 214,444 square feet according to the Offering Documents, far exceeding the commercial zoning limit of 145,910 square feet. There is insufficient commercial area available under zoning regulations for these three uses, let alone the 498 luxury hotel rooms as promised in the Offering Documents.

68.     The filings with the DOB and BSA show that no such convention center, performing arts center, or retail center was ever part of the plan.

69.     As recently as February 2021, Defendants perpetuated this falsehood, issuing a Project Progress Report telling the Limited Partners that the Project will contain a convention center, performing arts center, and a retail center.

70.     While Defendants were fully aware that their representations in the Offering Documents concerning the Project were false, Defendants have only recently admitted that the Project to be constructed is substantially different from what was described in the Offering Documents.

71.     Had Defendants provided Plaintiffs and Class Members with truthful and non-misleading information about the Project, Plaintiff and Class Members would not have signed the Offering Documents and invested $500,000 into the Partnership.

72.     According to the Economic Impact Study, the jobs created by the Project, which are essential for Plaintiffs and Class Members to obtain their unconditional permanent residency, will be calculated differently if the construction is a smaller building.

73.     In addition, there is necessarily a vast budget difference between the 643,180 square foot building as promised in the Offering Documents and the 350,000 square foot one in the currently approved plans.

74.     Defendants have never explained the impact of the reduced size of the Project on the budget and where the excess funds have been used or will be used.

**E.  Delay of the Project**

75.     The Project has been subject to inexplicable delay. According to the "Development Timeline" Section of the Business Plan, the exterior construction of the building, including the foundation and roofing, should have been completed more than four years ago.

76.     Yet, as of today, eight years after the Project started to recruit EB-5 investors, the Project has not even completed foundation work, and the project's job creation numbers fall far short of EB-5 requirements.

77.     Accordingly, Plaintiffs and Class Members have suffered damages, not only in their loss of investment in the Project, but also in their inability to obtain a permanent green card.

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that invested in the Partnership and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

79.     The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, there are at least 160 members of the Class.

80.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of law that is complained of herein.

81.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and complex commercial litigation.

82.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Defendants defrauded Plaintiffs and other Class Members as alleged herein;

(b)    whether the General Partner and Xia owed a fiduciary duty to Plaintiffs and other Class Members;

(c)    whether this fiduciary duty was breached;

(d)    whether the Developer and Xia aided and/or abetted this breach; and

(e)    to what extent Plaintiffs and Class Members have sustained damages and the proper measure of damages.

83.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small in relation to the cost of litigation, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Common Law Fraud
### Against All Defendants

84.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

85.    Defendants misrepresented in the Offering Documents that the planned mixed-use commercial Project consists of a building as large as 25 stories, with a luxury hotel, an international conventional center, and other features as set forth above, while contemporaneous filings with regulatory authorities show they knew these representations were not true.

86.    Defendants omitted material facts pertaining to the zoning and height restrictions precluding development of the Project as represented.

87.    Defendants made these representations and omissions with the intent that Plaintiff and the Class Members would rely on them to invest in the Partnership.

88.    Defendants knew, or were reckless in not knowing, when they solicited the EB-5 investments from Plaintiffs and the Class Members that the representations were false and there were material omissions in the Offering Documents.

89.    Defendants' misrepresentations and omissions were material to Plaintiffs' and the Class Members' decisions to invest in the Partnership.

90.    Plaintiffs and the Class Members have been damaged by making this investment when, if the true facts had been disclosed, they would not have done so.

91.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs and the Class Members, from an improper motive amounting to fraud and malice, and in conscious disregard of Plaintiffs and the Class Members'

rights. Thus, Plaintiffs and the Class Members are entitled to punitive damages in a sum appropriate to punish and make an example out of Defendants, and each of them.

## SECOND CLAIM

### Breach of Fiduciary Duty
### Against the General Partner and Xia

92.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

93.     As a fiduciary, the General Partner is obligated to act in the best interests of Plaintiffs and the Class Members as limited partners of the Partnership.

94.     The General Partner owes Plaintiffs and the Class Members the fiduciary duties of undivided loyalty, complete candor, utmost care, and good faith.

95.     The General Partner has engaged in a series of actions in disregard of its fiduciary duties to Plaintiffs and the Class Members.

96.     First, the General Partner breached its fiduciary duty by failing to honor the commitments stated in the Offering Documents.

97.     Second, the General Partner breached its fiduciary duty by failing to make complete and accurate disclosures concerning the zoning and height restrictions that preclude development of the Project as set forth in the Offering Documents.

98.     Third, the General Partner has the ongoing duty to keep Plaintiffs and the Class Members apprised of the development status and obstacles. However, the General Partner failed to notify them in the past five years that the Project is a dramatically scaled back 12-story hotel project without the listed features in the Offering Documents.

99.     Fourth, the General Partner breached its fiduciary duty by failing to comply with EB-5 related obligations, *i.e.*, delaying the Project work for years and failing to diligently ensure

that the Developer proceed with job creation to satisfy EB-5 requirements.

100.    Fifth, the General Partner breached its fiduciary duty by concealing material information from Plaintiffs and the Class Members and by failing to provide records of the Partnership, which would reveal the true status of and plans for the Project.

101.    As Xia manages, controls, and dominates the General Partner, he is subject to the same fiduciary duties as the General Partner and has breached his fiduciary duties based on the same conduct.

102.    By engaging in the above misconduct, the General Partner and Xia have breached their fiduciary duties, including the duties of loyalty, candor, good faith, and care to Plaintiffs and the Class Members.

103.    The General Partner and Xia committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs and the Class Members, from an improper motive amounting to fraud and malice, and in conscious disregard of Plaintiff's and Class Members' rights. Thus, Plaintiffs and the Class Members are entitled to punitive damages in a sum appropriate to punish and make an example out of the General Partner and Xia, and each of them.

104.    In addition to monetary and punitive damages, Plaintiffs and the Class Members are also entitled to an accounting of the Project and of the Partnership's assets as a further remedy for the General Partner's and Xia's breaches of fiduciary duty.

### THIRD CLAIM

**Aiding and Abetting Breach of Fiduciary Duty**
**Against Xia and the Developer**

105.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

106.    The General Partner breached its fiduciary duty to Plaintiffs and the Class Members as set forth in the Second Claim above.

107.    Xia dominates and controls the Developer and the General Partner. Under Xia's control and direction, the Developer and Xia, together with the General Partner, have participated in – and in fact have committed – the above detailed misconduct.

108.    Xia and the Developer have thereby knowingly provided substantial assistance to the General Partner in furthering its breach of fiduciary duty to Plaintiffs and the Class Members, and they have financially benefited from such breach.

109.    Xia and the Developer committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiff and the Class Members, from an improper motive amounting to fraud and malice, and in conscious disregard of Plaintiffs and the Class Members' rights. Thus, Plaintiffs and the Class Members are entitled to punitive damages in a sum appropriate to punish and make an example out of Xia and the Developer, and each of them.

110.    In addition to monetary and punitive damages, Plaintiffs and the Class Members are also entitled to an accounting of the Project and of the Partnership's assets as a further remedy for Xia's and the Developer's aiding and abetting the General Partner's breaches of fiduciary duty.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Ordering an accounting by the General Partner and Xia of the Project and of Partnership assets;

(d)      Awarding Plaintiffs and the Class punitive damages against Defendants;

(e)      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(f)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September  21, 2021

**REID & WISE LLC**

Shiyong Ye
sye@reidwise.com
Matthew Sava
sava@reidwise.com
One Penn Plaza, Suite 2015
New York, New York 10119
Telephone: (212) 858-9968

**GLANCY PRONGAY & MURRAY LLP**
Brian P. Murray
bmurray@glancylaw.com
Gregory B. Linkh
glinkh@glancylaw.com
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988

*Attorneys for Plaintiffs and Proposed Class*